UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| MICHELLE TULINO, |
| --- |
| Plaintiff, |
| -against- |
| THE CITY OF NEW YORK, et al., |
| Defendants. |

15-cv-7106 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

In this employment discrimination case, the jury returned a verdict in favor of plaintiff on her claims of hostile work environment and retaliation. Before the Court are the parties' post-verdict motions: plaintiff's motion for a new trial on her previously-dismissed claim of constructive discharge, ECF No. 209; defendants' motion for judgment as a matter of law on plaintiff's retaliation claim and for remittitur on plaintiff's hostile work environment claim, ECF No. 206; and plaintiff's motions for attorney's fees on behalf of both present and former counsel, ECF Nos. 199, 213.

For the reasons that follow, plaintiff's motion for a new trial and defendants' motion for judgment as a matter of law are denied. Defendants' motion for remittitur is granted to the extent of reducing the damages award to $1,250,000. Plaintiff's motions for attorney's fees are granted in the amounts of $299,726.79 for current counsel and $377,069.395 for former counsel.

1

## I. Background

The parties' familiarity with the procedural history and underlying facts of this case is presumed. As relevant here, plaintiff Michelle Tulino worked for the New York City Department of Small Business Services ("SBS") for several years, beginning in 2008, before resigning in 2015. After resigning, she filed this suit against the City and several employees alleging sixteen separate causes of action, including that her supervisor, defendant Shaazad Ali, had sexually harassed and assaulted her, in violation of federal, state, and local civil rights laws; that, when she reported Ali's conduct, the City retaliated by stripping her of job responsibilities; that the environment became so intolerable in the wake of her report that she was constructively discharged; that Ali and other employees spread defamatory rumors about her; that the City paid her less than similarly-situated male employees; that the City had violated state and federal minimum wage laws by failing to compensate her for all the time she worked; and that the City discriminatorily refused to promote her. See Compl., ECF No. 1.

At the time of filing her complaint, and for the next several years of litigation, Tulino was represented by Stagg, Terenzi, Confusione & Wabnik, L.L.P. ("STCW"). However, just days before trial was scheduled to begin, Tulino fired STCW. The Court granted an adjournment of several months, during which time Tulino hired

2

new counsel who represented her at trial (and continue to represent her during the litigation of these post-trial motions).

The great majority of Tulino's claims were dismissed, voluntarily or through motion practice, and she proceeded to trial on just four claims: hostile work environment, retaliation, and constructive discharge, all arising under the New York City Human Rights Law, as well as battery. At trial, Tulino testified that Ali, her supervisor, cultivated an inappropriately close relationship with her and became angry and resentful when Tulino tried to distance herself from him. Tulino further testified that, on November 12, 2014, she and Ali got into an argument, during which Tulino told him she would be reporting him to the EEO office because of his harassment. Ali then purportedly pushed Tulino against a filing cabinet and attempted to kiss her. Tulino's testimony was supported, in part, by exhibits containing email conversations between herself and Ali, as well as by several recordings, including of the November 12, 2014 conversation.

After the November 12 incident, Ali ordered Tulino to turn in her work BlackBerry, switched her to a different desk, and assigned another coworker, Bryana Shelton, as a "backup" for Tulino's work. Tulino testified that a great deal of her work was reassigned to Shelton. On November 17, Tulino sent an email to Ali, the EEO officer, and the head of Human Resources, claiming that Ali was retaliating against her after being "informed" on November 12 of

3

Tulino's "intention to request a full investigation of [Ali's] consistently untoward advances." Pl. Exh. 75.

An investigation was conducted, but, according to Tulino, the investigators failed to interview witnesses whom she said could corroborate her account of Ali's behavior. The investigation was ultimately closed without the agency taking action against Ali. Tulino testified that she was told by her superiors that she could "go back to [Ali]" or else she would "have no place" at SBS, and that the complaint she filed had "offended the agency." Tr. Feb. 21, 2019 at 187:15-17.

Tulino also called defendant Ali as a witness. During his testimony, Ali admitted that he spoke with Tulino - a woman some 30 years his junior - about how "some people" might try to advance their careers by having sex with their superiors, but that Tulino was "not the type of person who would sleep with an executive to get ahead." Tr. Feb. 22, 2019 at 396:11-12, 397:1-8. Ali admitted that he never had conversations about sex with the young men he worked with. Id. at 398:12-13. He also acknowledged writing an email - received in evidence as an exhibit - stating that he "care[d] too much" about Tulino and that he was "making a silly fool of [himself]." Id. at 425:7-23. He characterized his relationship with Tulino as "very close," but insisted it was friendship, nothing more. Id. at 433:9-10. He denied grabbing or otherwise assaulting Tulino.

4

Plaintiff's remaining witnesses were experts whose testimony - much of which was ultimately excluded by the Court - related to the subject of damages. Defendants presented testimony from three SBS employees.

Before submitting the case to the jury, the Court granted judgment as a matter of law in favor of defendants on the claim for constructive discharge. See Mem. dated Feb. 27, 2019, at 6-9 ("JMOL Mem."), ECF No. 179. The jury was therefore asked to determine liability on three claims - hostile work environment, retaliation, and battery - as well as whether punitive damages would be appropriate. The jury found defendants liable on the claims of hostile work environment and retaliation, but found in defendants' favor on the claim of battery. See Jury Verdict, ECF No. 181. The jury awarded plaintiff a total of $2,000,000 in compensatory damages for emotional distress, but declined to award punitive damages. Id.

II.  Discussion

## A.  Plaintiff's Motion for New Trial on Constructive Discharge

During trial, the Court entered judgment as a matter of law in favor of defendants, pursuant to Fed. R. Civ. P. 50, on plaintiff's claim for constructive discharge. See JMOL Mem. 6-7. Plaintiff takes issue with that decision and moves for a new trial on this claim. Pl. Mem. Supp. Mot. New Trial 4-5, ECF No. 211.

5

As an initial matter, the Court agrees with defendants that plaintiff's motion is properly construed as a motion for reconsideration. Although plaintiff suggests that de novo review is appropriate, her cases all concern appellate review of a district court's decision to grant judgment as a matter of law – not, as is the case here, a district court's review of its own prior decision. Moreover, plaintiff's motion cannot properly be construed as arising either under Rule 50(b) or Rule 59(a) of the Federal Rules of Civil Procedures. Rule 50(b) permits a party to renew a motion for judgment as a matter of law, but that does not apply here, since plaintiff is <u>contesting</u> the entry of judgment as a matter of law, not requesting it. Nor can plaintiff move for a new trial on the constructive discharge claim under Rule 59(a), which permits a new trial to be granted "when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." <u>Song v. Ives Labs., Inc.</u>, 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting <u>Smith v. Lightning Bolt Productions, Inc.</u>, 861 F.2d 363, 370 (2d Cir. 1988)).[1] Since the constructive discharge claim was never submitted to the jury, the jury never reached any verdict on that claim, much less a "seriously erroneous" verdict.

---

[1] Unless otherwise noted, quotations from cases cited herein omit internal quotation marks and alterations.

Accordingly, plaintiff's motion can only be construed as a motion for reconsideration pursuant to Local Civil Rule 6.3.[2] The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). Plaintiff points to no controlling authority, but simply reprises her argument that the New York City Human Rights Law requires a more liberal analysis than its federal counterpart. Pl. Mem. Supp. Mot. New Trial 6-7. The Court previously rejected this argument, see JMOL Mem. 6-7, and does so again. True, the Appellate Division, First Department has cautioned that "it should not be assumed that the standards for establishing constructive discharge under the City HRL are the same as have been set forth for title VII." Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP, 981 N.Y.S.2d 89, 92 (1st Dep't 2014). But neither the First Department, nor, to this Court's knowledge, any other New York state court, has affirmatively held that the City HRL in fact imposes a more lenient standard for constructive discharge claims.

---

[2] Technically, this motion may have been untimely. Local Civil Rule 6.3 requires a motion for reconsideration to be made within 14 days of the Court's order, or, for orders resulting in judgment, within 14 days of the entry of judgment. Here, judgment was entered on March 18, 2019, but plaintiff's motion was not filed until April 8. Because plaintiff complied with the briefing schedule ordered by the Court for the resolution of post-trial motions, however, and because the Court concludes that the motion must be denied for other reasons, the Court does not deny the motion as untimely.

7

To the contrary, the First Department has held that under the City HRL, constructive discharge claims are governed by a "stricter standard" than hostile work environment claims, La Porta v. Alacra, Inc., 38 N.Y.S.3d 20, 22 (1st Dep't 2016), requiring the plaintiff "to produce evidence that her employer deliberately created working conditions so intolerable, difficult or unpleasant that a reasonable person would have felt compelled to resign," Short v. Deutsche Bank Sec., Inc., 913 N.Y.S.2d 64, 66 (1st Dep't 2010) (quoting Mascola v. City Univ. of N.Y., 787 N.Y.S.2d 655, 656 (1st Dep't 2005)).

Plaintiff has adduced no controlling authority undermining the Court's earlier conclusion. Plaintiff cites to a decision of the New York City Commission on Human Rights, Pl. Mem. Supp. Mot. New Trial 7, but decisions of that administrative body are not authoritative pronouncements of law. In any event, even the Commission stated that the employee must prove that she "was subjected to an environment hostile enough to force her to quit." In re Comm'n on Human Rights ex rel. Cardenas v. Automatic Meter Reading Corp., 2015 WL 7260567, at *9 (N.Y.C. Comm'n Hum. Rts. Oct. 28, 2015) (quoting Zick v. Waterfront Comm'n of N.Y. Harbor, No. 11-cv-5093 (CM), 2012 WL 4785703, at *8 (S.D.N.Y. Oct. 4, 2012)). The standard plaintiff proposes thus appears to be materially identical to the federal standard in any event.

8

Nor has plaintiff pointed to material facts overlooked by the Court in its prior decision. After reporting Ali's alleged misconduct, plaintiff claims that her workload was substantially reduced, but it is undisputed that her pay did not decrease. "[P]laintiff's complaints about work assignments . . . do not demonstrate an intolerable work environment that would lead a reasonable person to feel compelled to resign." Short, 913 N.Y.S.2d at 66. Moreover, the fact that plaintiff was reassigned to a different supervisor distinguishes this case from those cited by plaintiff, where the employee was forced to keep working in close proximity with their alleged harasser. Cf. Halbrook v. Reichhold Chemicals, Inc., 735 F. Supp. 121, 126 (S.D.N.Y. 1990) (plaintiff stripped of duties and required "to work with the very supervisors who discriminatorily denied her promotion"); Teran v. JetBlue Airways Corp., 18 N.Y.S.3d 25, 26 (1st Dep't 2015) (plaintiff forced to choose between working with offending supervisor or taking pay cut).

Tulino points to her testimony wherein she claimed that, during a meeting with Andrew Schwartz (a Deputy Commissioner) and Sarah Krauss (the chief of staff), Schwartz and Krauss "told [Tulino] go back to Shaazad Ali or you have no place here" and said that Tulino's complaint "ha[d] offended the agency." Pl. Mem. Supp. Mot. New Trial 3 (citing Tr. Feb. 21, 2019 at 187:14-17). But even assuming (as the Court must) that the jury credited this

9

testimony, it appears on its face not to be a verbatim account of what Schwartz and/or Krauss actually said, but rather Tulino's impression of what they meant to convey. During her direct testimony, Tulino liberally paraphrased statements attributed to third parties, only to admit, upon further questioning from counsel or the Court, that the third party had not in fact said so much, or in so many words as Tulino initially claimed. E.g., Tr. Feb. 21, 2019, at 121:20-122:4; id. at 131:19-132:15; id. at 133:12-18. The statement attributed to Schwartz and/or Krauss here appears to be of that variety, but counsel never followed up to clarify what, exactly, Schwartz or Krauss had said, or to pin down whether Tulino claimed to be repeating their actual words or merely the impression she received from the interview. Based only on this vague and unexplained attribution, no reasonable jury could conclude that the agency was intentionally trying to force Tulino to resign.

Moreover, the statement attributed to Schwartz and Krauss must be viewed in conjunction with the final EEO report, which indicated that Tulino had refused any of the alternative assignments suggested to her, either because Tulino did not believe the assignment was comparable to her prior work or because she did not wish to be interviewed and compete with other candidates. See Tr. Feb. 22, 2019 at 299:4-12. In context, then, this statement appears not to be an ultimatum but a simple observation of fact:

if Tulino was unwilling to relocate to another part of the agency, then naturally her only options would be to remain in the same division as Ali or to leave. Cf. Terry v. Ashcroft, 336 F.3d 128, 152 (2d Cir. 2003) (evidence sufficient to survive summary judgment where employer allegedly told employee "your days are numbered" and coworker testified that the supervisor "was trying to make [the employee's] life so miserable he would quit"). This statement is therefore not the type of material fact that meets the strict standard for reconsideration.

Accordingly, plaintiff's motion for a new trial is denied.

B.    Defendants' Motions

1.    Motion for Judgment as a Matter of Law

Defendants move for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b), on plaintiff's claim of retaliation. The crux of Tulino's retaliation claim is that, after reporting Ali's harassment, her workspace was moved and her responsibilities were severely reduced. Defendants argue that (1) plaintiff never engaged in protected conduct prior to the complained-of retaliation, and (2) plaintiff's reduction in work responsibilities was the result of legitimate business decisions rather than discriminatory animus.

"A Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but

11

one conclusion as to the verdict that reasonable persons could have reached." Matusick v. Erie County Water Auth., 757 F.3d 31, 52 (2d Cir. 2014) (quoting Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005)). The evidence must be taken in the light most favorable to the non-moving party. Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir. 2001). "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." Cross, 417 F.3d at 248. Only "a complete absence of evidence" will justify granting the motion under such circumstances. Id. (quoting Song v. Ives Labs, Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)). Defendants have not carried their heavy burden here.

Under the New York City Human Rights Law, an employer may not retaliate against an employee because that employee has "opposed any practice forbidden" by that law. N.Y.C. Admin. Code § 8-107(7). Defendants argue that there is insufficient evidence that Tulino ever "opposed" discrimination prior to the alleged retaliatory acts. Def. Mem. Supp. Mot. JMOL 3, ECF No. 207. Although plaintiff testified that she told Ali, on November 12, that she intended to request an investigation based on his "untoward advances," Pl. Exh. 75, defendants argue that this testimony is contradicted by the recording of the conversation, Pl. Exh. 240. In that recording, plaintiff mentions going to EEO, but does not clearly indicate she will do so to report Ali's discrimination. Instead, she says she

12

will "go to EEO" unless Ali agreed to "[t]ell [her] what's happening." Piercey Decl. Exh. A at 3 of 81, ECF No. 208-1.

The Court is not persuaded. The recording does not appear on its face to capture the entirety of the conversation, so there is no inherent contradiction between plaintiff's testimony and the recording. Plaintiff specifically testified that she told Ali she would be reporting him to EEO, and that Ali responded by saying "You're finished. You're finished." Tr. Feb. 21, 2019 at 17:4-11. Additionally, the fact that Tulino claimed, in the November 17 email, to have said this to Ali is at least modestly corroborative of her testimony. The fact that these remarks do not appear on the recording might be reason to doubt Tulino's credibility, but the jury was fully capable of weighing that for itself, and it nonetheless apparently credited her account.[3]

Moreover, defendants ignore crucial context in taking the recording in isolation. Plaintiff testified that, by the time of this conversation, she had already complained to Ali about his alleged harassment, and the jurors were entitled to credit that testimony and take it into account in evaluating the meaning and context behind the November 12 exchange. There is no requirement (contrary to defendants' contention) that the opposition to

---

[3] Notably, defendants chose not to argue during summation that Tulino's testimony was contradicted by the recording of the November 12 encounter. The Court is extremely reluctant to discard a jury verdict based on a credibility argument that defendants apparently determined was not worth even presenting to the jury.

13

discrimination be explicit. See Mihalik v. Credit Agricole Cheuvreux N.A., Inc., 715 F.3d 102, 115 (2d Cir. 2013) (reversing grant of summary judgment on issue of retaliation because, "by implicitly referencing her rejection of his sexual propositions," employee "may have opposed his discrimination"); Albunio v. City of New York, 947 N.E.2d 135, 138 (N.Y. 2011) ("While [the employee] did not say in so many words that Sorrenti was a discrimination victim, a jury could find that both Hall and Albunio knew that he was, and that Albunio made clear her disapproval of that discrimination by communicating to Hall, in substance, that she thought Hall's treatment of Sorrenti was wrong."). Accordingly, a reasonable jury could have credited Tulino's testimony that she opposed Ali's discrimination before he retaliated against her.

Defendants next argue that plaintiff failed to establish pretext, because the complained-of actions were taken for "legitimate non-retaliatory reasons." Def. Mem. Supp. Mot. JMOL 6. As an initial matter, defendants did not raise this argument when they made their mid-trial Rule 50(a) motion and thus cannot press it now. See Tr. Feb. 25, 2019, at 601:16-603:20. A posttrial motion under Rule 50(b) "is limited to those grounds that were specifically raised in the prior motion" and "the movant is not permitted to add new grounds after trial." Tolbert, 242 F.3d at 70 (quoting McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997)).

14

In any event, to establish that the actions taken were legitimate, defendants merely cite to the testimony of Sarah Krauss and Andrew Schwartz. But it is the jury's prerogative to decide whether to believe plaintiff or the defendants' witnesses. The jury was not certainly not compelled to credit self-serving testimony by defendants' agents, and this Court may not rely on that testimony to determine defendants' entitlement to judgment as a matter of law. See Matusick, 757 F.3d at 52. Defendants inaccurately suggest that plaintiff offered no evidence of retaliatory intent. But plaintiff testified that Ali repeatedly told her that she needed his protection to advance in the agency, and that, after she told him she would report him to EEO, he responded "You're finished." The jury was permitted to credit this testimony and draw reasonable inferences from it. Moreover, as defendants concede, the City Human Rights Law permits an inference of retaliatory intent when the acts taken occur a short time after the employee's opposition to discrimination. See Teran v. JetBlue Airways Corp. 132 A.D.3d 493, 494 (1st Dep't 2015). Here, the reduction in Tulino's duties came almost immediately after the November 12 confrontation.

The Court acknowledges that plaintiff's proof of retaliation was far from overwhelming - indeed, it was exceedingly slim. Moreover, while the Court is required by law to assume the jury would have credited all of plaintiff's testimony on this count, it

15

is clear from the jury's rejection of plaintiff's battery claim that the jury did not credit all of her testimony across-the-board. Still, plaintiff adduced more than "a complete absence of evidence," Cross, 417 F.3d at 248 (quoting) Song, 957 F.2d at 1046), and the Court cannot say that no reasonable jury could possibly have found in plaintiff's favor on this issue. The Court therefore adheres to its earlier determination that the retaliation claim was properly allowed to proceed. Defendants' motion for judgment as a matter of law is denied.

### 2. Motion for Remittitur

Defendants next argue that the $2,000,000 verdict – representing $1,500,000 for the hostile work environment claim and $500,000 for retaliation – is excessive. Def. Mem. Supp. JMOL 8. The Court agrees that a reduction is necessary, although not to the extent urged by defendants.

Because Tulino's claims arise under New York law, the Court applies New York law to evaluate the damages award. Patterson v. Balsamico, 440 F.3d 104, 119 (2d Cir. 2006). New York law considers a damages award to be excessive "if it deviates materially from what would be reasonable compensation." Id. (quoting N.Y. C.P.L.R. § 5501(c)). Whether to grant remittitur is committed to Court's discretion, even if the award is larger than usual for this type of case. Id. at 120.

16

The Court is cognizant that emotional distress damages – the only kind at issue in this case – are inherently difficult to measure, and the risk of disproportionate jury verdicts motivated by sympathy is therefore high. Courts in this circuit frequently employ a rough framework dividing emotional distress cases into one of three categories. "Garden variety" cases are those where the evidence of harm is limited to the plaintiff's uncorroborated testimony. "Significant" cases include testimony by a medical professional or other evidence of treatment. "Egregious" cases feature truly shocking conduct or an especially severe impact on the plaintiff's health. See, e.g., Bouveng v. NYG Capital LLC, 175 F. Supp. 3d 280, 328 (S.D.N.Y. 2016). Here, plaintiff presented a medical expert, Dr. Laurence Westreich, who diagnosed her with post-traumatic stress disorder, panic attacks, and major depression. This case is therefore "significant" and accordingly warrants a substantial damages award.[4]

Nonetheless, in comparison with other comparable cases the current award appears excessive. It is true that in a somewhat similar case, involving race-based workplace discrimination that

_____

[4] Defendants argue that Dr. Westreich's testimony does not really count because Tulino never sought medical attention prior to 2015 and saw several other physicians before Dr. Westreich, none of whom testified. Def. Mem. Supp. JMOL 11. The Court rejects this argument. There is no requirement that a plaintiff prove damages by presenting the testimony of multiple treating physicians, nor is a plaintiff barred from seeking substantial damages for emotional distress simply because she did not seek treatment until after the distressing events were over.

17

resulted in post-traumatic stress disorder, depression, and panic disorder, the Second Circuit affirmed an award of $1,320,000. See Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 163 (2d Cir. 2014). However, the court noted that the award was at the upper end of the permissible range, id., and here the award is substantially larger. The Court concludes that the present award is too high and must be reduced to be more in line with Turley, let alone other cases. See, e.g., Zeno v. Pine Plains Cent. School Dist., 702 F.3d 655, 673 (2d Cir. 2012) (affirming award of $1,000,000 in school harassment case). Accordingly, the damages award shall be reduced to $1,250,000, comprising $1,000,000 for the hostile work environment claim and $250,000 for the retaliation claim.

## C. Motions for Attorney's Fees

The New York City Human Rights Law permits the "prevailing party" to recover "reasonable attorney's fees, expert fees and other costs." N.Y.C. Admin. Code § 8-502(g).[5] "In calculating attorney's fee awards, district courts use the lodestar method – hours reasonably expended multiplied by a reasonable hourly rate." McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006); accord N.Y.C.

---

[5] Defendants' repeated contention that expert fees "are not compensable 'costs' under Section 8-502(f)," Def. Fee Resp. Mem. 14, is irrelevant, because here it is section 8-502(g) that governs fee awards, and that subsection explicitly authorizes an award including expert fees.

18

Admin. Code § 8-502(g). "[T]rial courts need not, and indeed should not, become green-eyeshade accountants." Fox v. Vice, 563 U.S. 826, 838 (2011). The court may instead "take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." Id.; see also McDonald, 450 F.3d at 96 (court may "use a percentage reduction as a practical means of trimming fat from a fee application") (quoting Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998)).

Here, both plaintiff's current counsel and former counsel seek an award of fees. The Court considers each application in turn.

### 1. Current Counsel's Motion for Fees

Plaintiff's current counsel seeks a fee award totaling $352,619.75. See Pl. Fee Mem. 8, ECF No. 200; Pl. Fee Reply Mem. 8, ECF No. 225. Defendants do not challenge the hourly rates charged by counsel, and the Court finds those rates to be typical for lawyers of similar experience working in this District.

Defendants do, however, challenge the hours expended as excessive. The Court agrees, but only in part. The following factors persuade the Court that a modest reduction is appropriate. First, some of the time billed was for plaintiff's new lawyers to get up to speed on the case after she fired her previous attorneys, literally on the eve of trial. Although the Court permitted plaintiff to change her legal team, despite the late hour and

19

somewhat dubious grounds for doing so, "fees incurred because a change in counsel requires new counsel to 'get up to speed' are not appropriately passed on to a defendant." U.S. Bank N.A. v. Dexia Real Estate Capital Mkts., No. 12-cv-9412 (PAE), 2016 WL 6996176, at *9 (S.D.N.Y. Nov. 30, 2016) (quoting Entral Grp. Int'l L.L.C. v. N.Y. One Café Inc., No. 05-cv-1655 (CPS), 2007 WL 869587, at *10 (E.D.N.Y. March 20, 2007)).[6]

Second, counsel have billed for the time that attorney Todd Krakower spent observing, but not participating in, the trial. Counsel proposes that this time be discounted by 50%, but argues that his presence was necessary to help Phillip Pizzuto and Andrea Moss – the attorneys who actually tried the case – conduct legal research, suggest jury instructions, and draft a summation. Pl. Fee Reply Mem. 5. The Court is not persuaded that Pizzuto and Moss, two experienced and capable attorneys, required the presence of a third attorney in the courtroom, billing at $450 per hour, simply to conduct run-of-the-mill trial preparation. See Ng v. King Henry Realty, Inc., 16-cv-13 (PAE) (JCF), 2016 WL 6084074, at *6 (S.D.N.Y. Oct. 7, 2016) ("[C]ourts in this district have generally frowned upon awarding fees to more than two attorneys for court appearances unless the case is uniquely complex.").

---

[6] Plaintiff's contention that she "terminated her prior counsel for cause," Pl. Fee Reply Mem. 2, is simply not accurate. The Court made a detailed inquiry at the time and found that the termination was a function of plaintiff's overwrought reaction to her counsel's perfectly ordinary conduct and suggestions.

Third, counsel collectively billed for 38.5 hours of legal research during the trial dates. Nearly all of that billing was by Krakower, Pizzuto, or Moss (all of whom bill at the rate of $450 per hour); only a few hours of research were performed by Erika Minerowicz, who bills at $300 per hour. This amount of time on legal research seems excessive, given the relatively straightforward issues presented by this trial, and there is no obvious reason why the lower-billing Minerowicz could not have conducted more of the research.

Fourth, plaintiff hired a fourth attorney, Stephen Bergstein, to handle her motion for a new trial, as well as the opposition to defendants' motions.[7] Plaintiff has not prevailed on her motion, however. Moreover, unlike unsuccessful pre-trial motions, an unsuccessful post-trial motion has nothing to do with success at trial. Thus, Bergstein's hours spent on plaintiff's motion for a new trial should be substantially discounted.

Taking these considerations together, the Court concludes that an aggregate reduction of 15% is appropriate. Accordingly, current counsel is entitled to a total fee award of $299,726.79.

2. Former Counsel's Motion for Fees

---

[7] The Court is surprised that Pizzuto, Moss, and Krakower required a fourth attorney to handle the post-trial briefing, especially since both plaintiff's and defendants' motions are record-intensive and would likely benefit from pre-existing familiarity with the testimony and evidence. Nonetheless, it does not appear that Bergstein's work substantially duplicated work by any other attorney, and so the Court does not apply a reduction on that basis.

21

Plaintiff's former attorneys, STCW, have also made an application for fees. As an initial matter, defendants argue that STCW lack standing to seek fees on its own behalf. The Court agrees. The New York City Human Rights Law, like most statutes authorizing attorney's fees, permit fees to be awarded to "the prevailing party," N.Y.C. Admin. Code § 8-502(g), not to that party's counsel. Thus, "it is the prevailing party rather than the lawyer who is entitled to attorney's fees." Brown v. General Motors Corp., 722 F.2d 1009, 1011 (2d Cir. 1983).

However, at oral argument of the post-trial motions on July 2, 2019, the Court asked Ms. Tulino directly whether she wished to move for attorney's fees on behalf of her former counsel, and, after consulting with her current counsel, she confirmed that she did. That removes any standing defect. Moreover, based on STCW's representations, and the Court's review of the retainer agreement between STCW and plaintiff, plaintiff can only benefit from an award of fees to STCW, as that will offset her obligation to repay them for time spent on her case. Thus, STCW's interests in making this motion are substantially aligned with plaintiff's, unlike other cases where a discharged attorney sought to obtain fees to the detriment of their former client. E.g., id. (former counsel sought to derail settlement in order to obtain fee award). Under these circumstances, the Court sees no obstacle to entertaining STCW's fee application on the merits. Cf. id. (reaching merits of

22

claim for fees by former counsel where client had authorized former counsel to pursue claim on appeal).

STCW seeks fees and costs totaling $754,138.79, covering roughly three and one-half years of representation. Defendants seek a substantial reduction. The Court agrees that, for two reasons, the ultimate award must be substantially reduced.

First, although plaintiff did achieve a very favorable result at trial, STCW spent a great deal of time filing and litigating claims that were largely unrelated to the ultimately successful claims. The complaint included 16 causes of action against the City of New York and several individual defendants. Judge Furman, to whom the case was originally assigned, dismissed a host of claims, see Opinion and Order dated May 19, 2016, at 16, ECF No. 74, and granted summary judgment to defendants on several more, see Opinion and Order dated March 27, 2018, at 15, ECF No. 160 - including all minimum-wage and failure-to-promote claims, as well as all claims against six of the individual defendants. And plaintiff eventually voluntarily dismissed her equal-pay and defamation claims, as well as all claims against all defendants except the City and Ali.

The Court recognizes that pleadings are often imprecise, and that a party's theory of the case may sharpen over time and throughout discovery. Here, however, plaintiff's theory was only refined very late, and, importantly, after successor counsel took

23

over. STCW does not appear to have made any serious effort to separate viable claims from those that had no realistic chance of success. The hours spent by STCW were inflated by the need for discovery and motion practice regarding the many meritless claims that STCW chose to assert in this case. "A prevailing party who is entitled to a fee award for his successful prosecution of successful claims is not entitled to a fee award for unsuccessful claims that were based on different facts and different legal theories." Kirsch, 148 F.3d at 173.

Second, while STCW handled all the pre-trial matters, they did not actually try the case. The Court does not doubt that STCW's trial preparation likely made it easier for replacement counsel to hit the ground running, so to speak. But "[t]he most important factor in determining the reasonableness of a fee is the degree of success obtained." Pino v. Locascio, 101 F.3d 235, 237 (2d Cir. 1996). Here, it is difficult to say with confidence that STCW was responsible for Tulino's success at trial, as opposed to the lawyers who actually questioned witnesses and presented arguments to the jury. That is especially so where, as here, STCW asserted a veritable scattershot of claims, only a few of which ultimately proceeded to verdict. From the Court's perspective, it seems very likely that successor counsel's judgment in narrowing the issues presented to the jury was instrumental to achieving a successful

24

result. STCW's contribution to the verdict, on the other hand, was attenuated.

To account for the fact that STCW did not try the case, and wasted a great number of billed hours on meritless claims, the Court concludes that STCW's award should be reduced by 50%. The total award is therefore $377,069.395.

III. Conclusion

For the foregoing reasons, the Court rules as follows:

Plaintiff's motion for a new trial is denied.

Defendant's motion for judgment as a matter of law is denied.

Defendant's motion for remittitur is granted to the extent of reducing the verdict to $1,250,000, consisting of $1,000,000 for plaintiff's hostile work environment claim and $250,000 for plaintiff's retaliation claim.

Plaintiff's motion for attorney's fees on behalf of her current counsel is granted in the amount of $299,726.79.

Plaintiff's motion for attorney's fees on behalf of her former counsel is granted in the amount of $377,069.395.

Clerk to enter amended judgment and close all open docket entries.

SO ORDERED.

Dated:    New York, NY

          August $\underline{\phantom{I}}$, 2019          JED S. RAKOFF, U.S.D.J.

25